1    JEFF D. FRIEDMAN (173886)
     HAGENS BERMAN SOBOL SHAPIRO LLP
2    715 Hearst Avenue, Suite 202
     Berkeley, CA 94710
3    Telephone: (510) 725-3000
     Facsimile: (510) 725-3001
4    jefff@hbsslaw.com
      -and-
5    STEVE W. BERMAN (*Pro Hac Vice* pending)
     ARI Y. BROWN (*Pro Hac Vice* pending)
6    HAGENS BERMAN SOBOL SHAPIRO LLP
     1918 Eighth Avenue, Suite 3300
7    Seattle, WA  98101
     Telephone:  (206) 623-7292
8    Facsimile:  (206) 623-0594
     steve@hbsslaw.com
9    arib@hbsslaw.com

10

11

12                          UNITED STATES DISTRICT COURT

13                         NORTHERN DISTRICT OF CALIFORNIA

14

15

16   BRITTA BREWER; STACEY MADAMBA, on )
     behalf of themselves and all others similarly )    No.
17   situated,                                    )
                                                  )    **CLASS ACTION**
18                              Plaintiffs,        )
                                                  )    **COMPLAINT FOR DAMAGES,**
19            v.                                   )    **RESTITUTION, AND INJUNCTIVE**
                                                  )    **RELIEF**
20   BANK OF AMERICA, N.A. and BAC               )
     HOME LOANS SERVICING, LP,                    )    **JURY TRIAL DEMANDED**
21                                                )
                                Defendants.        )
22                                                )

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................... 1

II.     JURISDICTION ...................................................................................................... 5

III.    PARTIES ................................................................................................................. 5

IV.     FACTUAL BACKGROUND ................................................................................. 6

      A.     The Foreclosure Crisis ............................................................................... 6

      B.     Creation of the Home Affordable Modification Program ........................... 6

      C.     Duties of a Participating Servicer Under HAMP ........................................ 8

      D.     Plaintiffs' Effort to Obtain a Loan Modification Under HAMP ................ 12

            1.     Britta Brewer ................................................................................. 12

            2.     Stacey Madamba ............................................................................ 15

      E.     Class Allegations ....................................................................................... 18

COUNT I:   BREACH OF CONTRACT / BREACH OF DUTY OF GOOD
            FAITH AND FAIR DEALING ............................................................... 21

COUNT II:   PROMISSORY ESTOPPEL, IN THE ALTERNATIVE ............................. 22

COUNT III:   VIOLATION OF BUSINESS AND PROFESSIONS CODE
            SECTIONS 17200 ET SEQ. .................................................................... 23

V.      PRAYER FOR RELIEF ........................................................................................ 23

VI.     JURY TRIAL DEMANDED ................................................................................ 24

## I.     INTRODUCTION

1.     In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds along with a partial guarantee against losses on $118 billion in mortgage-related assets.  By accepting this payment, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish necessary to minimize foreclosures.

2.     Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.  Companies that accepted money under the TARP are subject to mandatory inclusion in HAMP as are certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

3.     Bank of America signed a contract with the U.S. Treasury on April 17, 2009 (attached as Exhibit 1 and included by reference) agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.  The guidelines issued by the Treasury Department set forth a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, must:

- identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;
- collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

010176-12  366276 V1

- institute a modified loan with a reduced payment amount as per a mandated formula, that is effective for a three-month trial period for borrowers that are eligible for a modification; and

- provide a permanently modified loan to those homeowners who comply with the requirements during the trial period. Whether the homeowner qualifies for a modification or not, participating servicers are also required to provide written notices to every mortgage borrower that has been evaluated for a loan modification, whether or not the borrower has been found eligible.

4.      HAMP and its associated directives also set prohibitions against certain conduct *including demanding upfront payments in order to be evaluated for a loan modification*, instituting or continuing foreclosures while a borrower is being evaluated for a loan modification, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

5.      Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

6.      Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification. However, this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as Bank of America to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by the servicer such as Bank of America. On information and belief, Bank of America does not own a significant majority of the loans on which it functions as a servicer.

010176-12 366276 V1

1          7.      Economic factors that discourage Bank of America from meeting its contractual

2    obligations under HAMP by facilitating loan modifications include the following:[1]

3          • Bank of America may be required to repurchase loans from the investor in order

4              to permanently modify the loan.  This presents a substantial cost and loss of

5              revenue that can be avoided by keeping the loan in a state of temporary

6              modification or lingering default.

7          • The monthly service fee that Bank of America, as the servicer collects as to each

8              loan it services in a pool of loans, is calculated as a fixed percentage of the

9              unpaid principal balance of the loans in the pool.  Consequently, modifying a

10             loan to reduce the principal balance results in a lower monthly fee to the

11             servicer.

12         • Fees that Bank of America charges borrowers that are in default constitute a

13             significant source of revenue to the servicer.  Aside from income Bank of

14             America directly receives, late fees and "process management fees" are often

15             added to the principal loan amount thereby increasing the unpaid balance in a

16             pool of loans and increasing the amount of the servicer's monthly service fee.

17         • Entering into a permanent modification will often delay a servicer's ability to

18             recover advances it is required to make to investors of the unpaid principal and

19             interest payment of a non-performing loan.  The servicer's right to recover

20             expenses from an investor in a loan modification, rather than a foreclosure, is

21             often less clear and less generous.

22         • Fixed overhead costs involved in successfully performing loan modifications

23             involve up-front cost to the servicer for additional staffing, physical

24             infrastructure, and expenses such as property valuation, credit reports and

25             financing costs.

26

27
_____

28    [1]    *See* Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

8.     Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Bank of America has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States. Bank of America's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by Bank of America, who are eligible for permanent loan modifications, and who have met the requirements for participation in the HAMP program, have not received permanent loan modifications to which they are entitled.

9.     In addition to its obligations based on its contract with the Treasury Department, Bank of America has entered into written agreements with individual homeowners, including Plaintiffs, for temporary loan modifications that must be converted to permanent loan modifications. Plaintiffs and a similar class of borrowers have complied with the agreements by submitting the documentation asked of them and, when requested, by making payments. Despite Plaintiffs' efforts, Defendant has ignored its contractual obligation to modify their loans permanently.

10.     Because Bank of America is not meeting its contractual obligations, at least hundreds of California homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, Bank of America has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification from Bank of America. Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are illegal under California law.

11.     Plaintiffs, Britta Brewer and Stacey Madamba bring this suit on behalf of themselves and a Class of similarly situated California residents ("Plaintiffs") to challenge the failure of Defendant Bank of America Bank, N.A. and its subsidiary BAC Home Loans Servicing, LP (collectively referred to as "Defendants" or "Bank of America") to honor the terms of their agreement with the United States Treasury for the intended benefit of homeowners, their failure to

honor agreements directly with individual homeowners to modify mortgages to a point that they are affordable and sustainable, and to recover costs and losses incurred as a result.

## II.   JURISDICTION

12.   This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the Class are citizens of a State different from the Defendants.

13.   This Court also has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 in that the Plaintiffs are intended, third-party beneficiaries to a contract between Bank of America and the U.S. Treasury that was entered into pursuant to and under the direction of TARP.  12 U.S.C. § 5201 *et seq.*

14.   This Court has personal jurisdiction over the parties in this action by the fact that Defendants are corporations that are licensed to do business in the state of California or otherwise conduct business in the state of California.

15.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendants regularly conduct business in this District, and one of the named Plaintiffs resides in this District.

## III.   PARTIES

16.   Plaintiff Britta Brewer is an individual residing in Cardiff, California.

17.   Plaintiff Stacey Madamba is an individual residing in San Francisco, California.

18.   Defendant Bank of America, N.A. is a mortgage lender headquartered in Charlotte, NC.  Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., and is located in Calabasas, CA.  Defendants are collectively referred to as "Bank of America" and are currently doing business and maintaining office branches throughout the State of California.

# IV. FACTUAL BACKGROUND

## A. The Foreclosure Crisis

19. Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[2]

20. California has been consistently one of the hardest hit by the housing crisis. California ranks fourth highest on the state foreclosure list in the United States for all of 2009. The number of total California properties with foreclosure filings in 2009 was 632,573. This represents nearly a 21% increase over 2008 and a 153% increase from 2007.[3]

21. In the first quarter of 2009, California posted the nation's third highest foreclosure rate. California was one of five states in 2009 that accounted for nearly 60 percent of the nation's first quarter total. California had 230,915 foreclosure filings during the first quarter and accounted for nearly 29 percent of the nation's total. The state's foreclosure activity increased 35 percent from the previous quarter and 36 percent from Q1 2008.[4]

22. Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011. *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, Figure 30, available at http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

## B. Creation of the Home Affordable Modification Program

23. Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A § 5201 *et seq.* (2009)

---

[2] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report100909-cop.cfin.

[3] http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333

[4] http://www.keepmyhouse.com/2009/04/16/latest-foreclosure-statistics-us-foreclosures-increase-by-9/

CLASS ACTION COMPLAINT     - 6 -

24.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." *Id.*

25.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

26.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

27.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

28.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

29.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C. § 5220.

30.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

31.     The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

32.     The second subprogram relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

33. HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

**C. Duties of a Participating Servicer Under HAMP**

34. Because Bank of America accepted $25 billion in federal funds and additional loan guarantees, it was required to participate in HAMP for the loans on which it functions as a loan "servicer." On April 17, 2009, Steve R. Bailey, of Bank of America, N.A., executed a Servicer Participation Agreement ("SPA") with the federal government. A copy of this SPA is attached as Ex. 1.

35. The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA I.A.), and are incorporated by reference herein. The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." SPA I.A., 2.A.[5]

36. The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels." Ex. 2 at p. 1. This directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments." *Id.*

37. The Program Documentation requires Participating Servicers to evaluate *all loans* which are 60 or more days delinquent or appear to be in imminent default (as defined by the

---

[5] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation-Frequently Asked Questions ("HAMP FAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5). These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiffs as well as herein.

CLASS ACTION COMPLAINT                                    - 8 -

Program Documentation), to determine which loans meet the HAMP eligibility criteria. *Id.* at p. 4. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification. *Id.* at pp. 3-4.

38.     A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP"). Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.[6]

39.     A Mortgage is eligible for the HAMP if criteria enumerated in the Program Documentation are met. Aside from criteria that require that the loan be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income. *Id.* at p. 2.

40.     The servicer must "provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions." *Id.* at p. 13.

41.     Once the participating servicer has determined a mortgage borrower's eligibility in the HAMP, the servicer must apply the modification steps enumerated in the Program Documentation, in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income. These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary). *See* Ex. 2 at pp. 8-10; *see also* Ex. 3 at p. 2.

---

[6]     The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in Exhibit 2. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

CLASS ACTION COMPLAINT                    - 9 -

010176-12 366276 V1

42.     After applying the enumerated modification steps to calculate the modified payment amount, a servicer must offer the borrower a TPP. The TPP consists of a three-month period in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation. Bank of America uses a standard form agreement to offer TPPs to eligible homeowners. This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

43.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner must be offered a permanent modification. The payment amount and interest rate in the modified loan are fixed for five years and equal to the payment amount and interest rate in the TPP. Thereafter, the rate may escalate annually by up to one percent until it reaches an interest cap which is the lesser of: (i) the fully indexed and fully amortizing contract rate or (ii) the Freddie Mac Primary Mortgage market Survey rate for 30-year fixed rate mortgage loans on the date the modification is prepared. Once capped, the rate is fixed for the remainder of the term. *See* Ex. 2 at p. 9.

44.     HAMP prohibits a participating servicer from taking several actions including the following:

- Proceeding with a foreclosure sale. Any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period, and until the borrower has been considered and found ineligible for other available foreclosure prevention options. *See* Ex. 4 at Q63; *see also* Ex. 2 at p. 14.

- Requiring a borrower to make an initial contribution payment pending the processing of the trial period plan before the plan starts. Ex. 4 at Q. 83.

- Soliciting borrowers to opt out of consideration for HAMP during the temporary review period. Ex. 6 at Q1230-02.

- Reporting borrowers as delinquent to credit reporting bureaus without explanation. For borrowers who are current when they enter a trial period, the servicer should

report the borrower current but on modified payment if the borrower makes timely
payments during the trial period.  For borrowers who are delinquent when they enter
the trial period, the servicer should report in such a manner that accurately reflects
the borrower's current workout status.  Ex. 2 at p. 22.

- Assessing prepayment penalties for full or partial prepayment as part of the
modification.  Ex. 4 at Q. 25.

45.    The HAMP requires a participating servicer to send a Borrower Notice to every
borrower that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered an
official HAMP modification, or is at risk of losing eligibility for HAMP because they have failed
to provide required financial documentation.  Ex. 5 at p. 1.

46.    The HAMP presumes that final modifications will be extended and finalized upon
completion of a TPP or shortly thereafter.  HAMP Supplemental Documentation dated
December 22, 2009 addresses situations in which the borrower has completed the TPP but has not
yet received a permanent modification.

> In situations where an eligible borrower successfully completed the
> trial period and should have been converted to a permanent
> modification, but for reasons beyond their control were not timely
> evaluated for a permanent modification, the servicer must promptly
> make a determination as to whether the borrower is eligible for a
> permanent HAMP modification.  If the borrower is eligible, then the
> servicer must offer the borrower a permanent HAMP modification as
> soon as possible, but in no event later than sixty days after
> discovering the error.

Ex. 6 at Q1222-01.

47.    By entering into the SPA, Bank of America covenanted that all services will be
performed in compliance with all applicable Federal, state and local laws, specifically including
state laws designed to prevent unfair, discriminatory or predatory lending practices.  Ex. 1 at ¶ 5(b).

48.    Under the SPA, Bank of America also covenanted that it would perform the services
required under the Program Documentation and the Agreement in accordance with the practices,
high professional standards of care, and degree of attention used in a well managed operation, and
no less than which Bank of America exercises for itself under similar circumstances, and that Bank

1  of America would use qualified individuals with suitable training, education, experience and skills

2  to perform the Services.  *Id.* at ¶ 5(d).

3       49.     Bank of America has routinely failed to meet its obligations under the Program

4  Directive.  Mortgage borrowers who request to be evaluated for a modification under HAMP

5  routinely face unexplained delays and go weeks or months with no communication from Bank of

6  America after providing the requested information.  Borrowers who attempt to contact Bank of

7  America by telephone face long periods of time on hold and are transferred between service

8  representatives in a deliberate effort to cause the borrower to give up and to terminate the call.

9  Bank of America regularly falsely informs borrowers that it did not receive requested information

10 and demands that documents be re-sent.

11      50.     Bank of America has routinely failed to live up to its end of the TPP Agreement and

12 offer permanent modifications to homeowners.  In January 2010, the U.S. Treasury reported that

13 Bank of America had 1,066,025 HAMP-eligible loans in its portfolio.  Trial periods have been

14 started on only 237,766 of these loans.  Of those, just 12,761 resulted in permanent modifications

15 (only 5% of the started Trial modifications and just over 1% of the eligible pool) even though

16 many more homeowners had made the payments and submitted the documentation required by the

17 TPP Agreement.  The Treasury Report is attached hereto as Exhibit 7.

18      51.     By failing to live up to the TPP Agreement and convert TPPs into permanent

19 modifications, Bank of America is leaving homeowners in limbo, wondering if their home can be

20 saved and preventing homeowners from pursuing other avenues of resolution, including using the

21 money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short

22 sales or other means of curing their default.

23 **D.     Plaintiffs' Effort to Obtain a Loan Modification Under HAMP**

24     **1.     Britta Brewer**

25      52.     Plaintiff Britta Brewer purchased her home in 2004 in which she lives with her

26 husband and their three children as their primary residence.  The mortgage loan and title to the

27 property is solely in Ms. Brewer's name.  Her mortgage was originated by Greenpoint mortgage

28 and transferred to Bank of America via Countrywide Mortgage. The loan carried an adjustable

CLASS ACTION COMPLAINT                    - 12 -

1    interest rate.  In November 2008, the interest rate adjusted causing the payments required under the

2    mortgage to jump from $2,825.74 due each month, to $4,164.36 for principal, interest, taxes and

3    insurance.

4         53.     Ms. Brewer and her husband own and operate a small insurance brokerage business.

5    In the autumn of 2008, the Brewers' income dropped as a result of a slowdown in business.  The

6    drop in their personal income, the increase in the mortgage payments due each month, and

7    unexpected business costs caused Ms. Brewer to fall behind on the mortgage payments.

8         54.     In approximately February 2009, the Brewers hired and paid a "loan modification

9    company" to assist them in negotiating for a loan modification with their lender and loan servicer.

10   The Brewers provided all personal and financial information requested by the loan modification

11   company and were told that the documents would be forwarded to their loan servicer for the

12   purpose of obtaining a loan modification.

13        55.     Between March and August 2009, the Brewers were consistently informed by the

14   loan modification company that a modification was in process.  In August 2009, Bank of America

15   sent an email confirming that it had received a request for mortgage assistance regarding Ms.

16   Brewer's loan.  Bank of America followed this email with a letter similarly confirming that it had

17   received the request for assistance.

18        56.     In September 2009, the Brewers were approached by a realtor offering to buy their

19   home as part of a short sale because their mortgage was in default.  On September 15, 2009, Ms.

20   Brewer called Bank of America's foreclosure department.  A representative claimed that Bank of

21   America had not received financial documents from the Brewers, though she did acknowledge that

22   a previous representative had indeed informed the loan modification company, acting on behalf of

23   the Brewers, that a modification process had been started.  The Bank of America Representative

24   proceeded to interview Ms. Brewer over the telephone for the purpose of restarting the loan

25   modification process.  She then instructed Ms. Brewer as to the documents required to support this

26   process.

27        57.     On September 16, 2009, following instructions from the Bank of America

28   representative, Ms. Brewer faxed Bank of America documents required to obtain a loan

CLASS ACTION COMPLAINT                        - 13 -

010176-12 366276 V1

1    modification under the HAMP, including bank statements, profit and loss statements for their

2    business, tax returns, and a signed hardship letter.

3        58.    On October 1, 2009, a notice of foreclosure sale was posted on the Brewers' door.

4    Ms. Brewer made several calls to Bank of America over the next week in which she was regularly

5    put on hold for an hour or more.  Ms. Brewer was told the request was in process and that she

6    should continue to check back by phone.

7        59.    On October 8, 2009, Ms. Brewer spoke with Danielle Stewart, a Bank of America

8    representative who informed her that her temporary modification had been approved.  Bank of

9    America instructed her to send in another copy of a letter explaining the need for a loan

10   modification, bank statements, tax returns, profit and loss statement for their business, and an IRS

11   form 4506T.  Bank of America also instructed Ms. Brewer to begin making modified loan

12   payments of $1,977 per month for the next three months and, if she made timely payments, she

13   would receive documents to permanently modify the mortgage loan under HAMP.

14       60.    The following day, Ms. Brewer sent all of the documents Bank of America

15   requested along with a check for $1,977.  Bank of America accepted and cashed Ms. Brewer's

16   payment.  On October 16, 2009, Bank of America acknowledged receipt of the documents.

17       61.    Ms. Brewer tendered timely payment of $1,977 to Bank of America in November

18   and December 2009 and in January 2010.  Bank of America accepted each payment and cashed

19   each check.

20       62.    In December 2009, after she had made her third payment, Ms. Brewer inquired of

21   Bank of America as to why she had not received documents regarding her loan modification.  Bank

22   of America informed her that they were running behind and instructed her to continue making the

23   modified payment.

24       63.    In late January 2010, Bank of America sent Ms. Brewer a Notice of Intent to

25   Accelerate the loan.  The notice claimed the loan was in default and demanded immediate payment

26   of over $46,000.  Ms. Brewer called Bank of America again to inquire as to the status of her loan

27   modification.  Bank of America claimed that she was not eligible to receive a loan modification

28

010176-12 366276 V1

1    and claimed to have no knowledge of a Temporary Payment Plan for Ms. Brewer. Bank of

2    America further stated that there would be no permanent loan modification forthcoming.

3        64.    Despite compliance with all of Bank of America's instructions, and all

4    responsibilities under the terms of the HAMP program directives, Ms. Brewer has not been

5    provided a Loan Modification Agreement under the HAMP Program guidelines to date.

6        65.    Ms. Brewer and her husband have spent significant time and money in efforts to

7    modify this loan with Bank of America including but not limited to, amounts paid to a mortgage

8    modification service, postage and fax fees, and dozens of hours on the telephone.

9        66.    Like hundreds or even thousands of California residents, Mr. and Ms. Brewer have

10   been living in limbo, without any assurances that their home will not be foreclosed, despite

11   compliance with HAMP requirements and continued monthly payments under the agreement

12   dictated by Bank of America. They have invested their limited resources in modified payments

13   based on the promise that doing so would result in a permanent loan modification.

14   **2.    Stacey Madamba**

15       67.    Plaintiff Stacey Madamba purchased her home in 2007 and obtained both a first and

16   second mortgage from Bank of America. The first mortgage loan required principal and interest

17   payments of $2,517.18 per month while the second mortgage required principal and interest

18   payments of $756.77 per month.

19       68.    Toward the end of 2008, Ms. Madamba experienced a drop in her household

20   income. Nevertheless, she continued to make all of her mortgage payments in full and on time

21   through October 2009. Throughout 2009, the payments required to fully service the mortgage

22   loans were not affordable and Ms. Madamba was forced to use most of her personal savings in

23   order to continue to meet the required monthly payments.

24       69.    On October 18 and 19, 2009, Bank of America representatives attended a public

25   event entitled the "NACA Dream Event" put on by the Neighborhood Assistance Corporation of

26   America ("NACA"). Through this and other events, NACA works directly with mortgage

27   servicers, including Bank of America, and purports to assist mortgage borrowers in their efforts to

28   obtain loan modifications. Ms. Madamba took three days off of work to attend this event. During

CLASS ACTION COMPLAINT          - 15 -

the first day of the event, she was informed as to which documents she would need to submit in support of an application for a loan modification.

70.     Ms. Madamba completed and submitted an application for a loan modification to a Bank of America representative present at the NACA event and scheduled an appointment to meet with a Bank of America representative the following day.  On October 20, 2009, Ms. Madamba met, in person, with a Bank of America representative named Sean Pendergast.  Mr. Pendergast confirmed that she had provided all required documentation which included a hardship letter, income statements, and tax and insurance information, and informed Ms. Madamba that she was approved for a loan modification program with Bank of America and that she would receive a letter stating the terms of the agreement to modify her loans which would begin on February 1, 2010.

71.     Mr. Pendergast specifically instructed Ms. Madamba to stop making payments on her mortgage until February 2010 – the date the modified mortgage agreement would take effect. Indeed, he cancelled the automatic payment instructions that Ms. Madamba used to automatically pay her mortgage out of her Bank of America checking account.

72.     On November 17, 2009, Ms. Madamba received two separate Terms and Conditions Agreements from Bank of America – respectively stating the terms and conditions under which the first loan and the second loan would be modified.  Each agreement was accompanied by a cover letter, respectively dated November 12 and November 13, 2009. Both letters opened with the following:

> This letter constitutes our offer to modify the Mortgage identified
> above, subject to the terms and conditions agreement.  When signed
> by you, this letter will also constitute your acceptance and agreement
> to these terms and conditions.

A copy of these letters and the accompanying agreements are attached as Exhibit 9.

73.     The Terms and Conditions Agreement for the first loan states that the principal balance will be $360,047.14 with an interest rate of 3%, and requires monthly Principal and Interest payments of $1,591.23 beginning February 1, 2009 (sic).[7]

---

[7] Ms. Madamba confirmed that the February 1, 2009 start date was a typographical error that should have read February 1, 2010.

010176-12 366276 V1

74.   The Terms and Conditions Agreement for the second loan states that the principal balance will be $90,888.74, with an interest rate of 2%, and requires monthly Principal and Interest payments of $355.07 beginning February 1, 2010.

75.   Ms. Madamba signed both Terms and Conditions Agreements on November 17, 2009 and returned them to Bank of America on the same date using the self-addressed stamped envelope Bank of America sent along with the two Agreements.

76.   Just prior to receiving the Terms and Conditions in the mail, Ms. Madamba received a call from Mr. Pendergast who summarized the terms she would be receiving in the mail, but instructed her to add $119 to each payment for the first loan, which he claimed to be for payment of taxes.   He again reminded her not to make any payments until February 2010.

77.   On or about January 11, 2010, Ms. Madamba received a letter from Bank of America summarizing the terms of the modification to the second loan, which were consistent with the Terms and Conditions Agreement she had previously accepted and returned, but instructing that payment on this loan be received no later than January 21, 2010.   Enclosed with that letter was a "Loan Modification Agreement" on terms consistent with the terms Ms. Madamba previously accepted regarding the second loan.   On January 15, 2010, Ms. Madamba returned a signed and notarized copy of the Loan Modification Agreement and tendered a check in the amount of $355.07 to Bank of America, referencing the loan number and that it was for the February payment.   Bank of America accepted this payment and cashed the check.

78.   On January 25, 2010, Ms. Madamba tendered to Bank of America a check in the amount of $1,710.23 (payment of $1,591.23 stated in the Terms and Conditions Agreement for the first loan plus $119 as instructed by Mr. Pendergast).   The check referenced the loan number and that it was the first payment of a loan modification.   Bank of America accepted this payment and cashed the check.

79.   Prior to the first of each month, Ms. Madamba has tendered checks to Bank of America in the amounts of $1,710.23 and $355.07, constituting the payments for March, April, and May 2010.   Bank of America has accepted each payment and cashed each check.

80. On March 22, 2010, Ms. Madamba received a notice from Bank of America stating that her modification had been rejected.

81. On March 23, 2010, Ms. Madamba called Bank of America and, after being transferred several times and placed on hold for long stretches at a time, was told by different representatives that she had never been approved for a loan modification; that she had been approved for a modification, but that she had failed to live up to the terms; that her documentation had been lost; and that the modification that had been offered and that she accepted was not actually a binding agreement; and that she currently owed an additional $9,000.

82. Despite compliance with all of Bank of America's instructions, and all responsibilities under the terms of the HAMP program directives, Bank of America refuses to recognize or honor its agreement to modify Ms. Madamba's mortgage loans as required under the terms of the HAMP Program guidelines or under the terms of the Terms and Conditions Agreements that were offered and accepted.

83. Ms. Madamba has spent significant time and money in efforts to modify this loan with Bank of America including, but not limited to, amounts paid to a mortgage modification service, overnight postage fees, copying costs, several days of missed work, and dozens of hours on the telephone.

84. Like hundreds or even thousands of California residents, Ms. Madamba has been living in limbo, without any assurances that her home will not be foreclosed, despite compliance with HAMP requirements and continued monthly payments under the agreement dictated by Bank of America. She has invested her limited resources in modified payments based on the promise that doing so would result in a permanent loan modification.

**E. Class Allegations**

85. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

86. Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and a Class consisting of:

> All California homeowners whose loans have been serviced by one or both Defendants and who, since April 13, 2009, have requested or been otherwise eligible for a TPP under the terms of HAMP Program

1

Documentation and who have not received a permanent loan
modification either because they have not been offered a TPP by
Bank of America or because they did not receive a permanent loan
modification after they complied with their obligations under HAMP
as conveyed to them by Bank of America, as required by HAMP.

87.    Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, Defendants' current or former employees, officers, directors, agents, representatives, their family members, the members of this Court and its staff.

88.    Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses many hundreds and perhaps thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

89.    Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

90.    All members of the Class have been subject to and affected by the same conduct.  The claims are based on the terms of a single unifying contract between Bank of America and Fannie Mae, acting as agent for the United States Treasury, and on form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the Class.  These questions include, but are not limited to the following:

    a.    The nature, scope and operation of Bank of America's obligations to homeowners under HAMP;

    b.    Whether Bank of America breached its duties under HAMP that were intended for the benefit of Class members;

    c.    Whether the manner in which Bank of America has executed the duties it undertook as part of the HAMP program violates its duty of good faith and fair dealing;

    d.    Whether Bank of America's receipt of an executed TPP Agreement, along with supporting documentation and three monthly payments, creates a

010176-12 366276 V1

binding contract or otherwise legally obligates Bank of America to offer Class members a permanent HAMP modification;

e.  Whether Bank of America's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

f.  Whether Bank of America demanded and collected initial payments from eligible homeowners in violation of HAMP provisions;

g.  Whether Bank of America's written representations to homeowners stating that they would receive permanent loan modifications upon successful completion of the trial period and then failing to deliver such permanent modification constitutes an unfair or deceptive practice under the California Unfair Competition Law ("UCL");

j.  Whether the above practices caused Class members to suffer injury; and

k.  The proper measure of damages and the appropriate injunctive relief.

91.  The claims of the individual named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiffs and the other members of the Class were subject to the same conduct, were subject to the terms of the same agreement and were met with the same absence of a permanent modification.

92.  The individual named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the Class's claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

93.  A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

94.  This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

010176-12 366276 V1

95.     Bank of America has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I

### BREACH OF CONTRACT / BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

96.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

97.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

98.     The SPA and the explicitly incorporated Program Documentation constitute a contract for which Plaintiffs and the Class are intended beneficiaries, and under which Bank of America has undertaken duties to act for the benefit of Plaintiffs and the Class.

99.     By entering into the SPA and accepting valuable consideration including $25 billion in funds from the U.S. Treasury, Bank of America covenanted, on behalf of itself and its subsidiaries, to administer its contractual obligations with principles of good faith and fair dealing.

100.    Bank of America has breached its contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting introductory payments.

101.    In addition to duties to Plaintiffs based on their status as third-party beneficiaries of the SPA, Bank of America entered into individual contracts directly with Plaintiffs.

102.    The Agreement sent by Bank of America to Plaintiffs constitutes a valid offer.

103.    By executing the Agreement and returning it to Bank of America, along with the supporting documentation, Plaintiffs accepted Bank of America's offer.

104.    Alternatively, Plaintiffs' return of the Agreement constitutes an offer.  Acceptance of this offer occurred when Bank of America accepted Plaintiffs' TPP payments.

105.    Plaintiffs' TPP payments to Bank of America constitute consideration.  By making those payments, Plaintiffs gave up the ability to pursue other means of saving their home.

106.    Plaintiffs and Bank of America thereby formed valid contracts.

CLASS ACTION COMPLAINT                              - 21 -

107.    To the extent that the contracts were subject to a condition subsequently providing Bank of America an opportunity to review the documentation submitted by Plaintiffs when they returned the signed TPP, this condition was waived by Bank of America and/or it is estopped to assert it as a defense to Plaintiffs' claims.

108.    By failing to offer Plaintiffs permanent HAMP modifications, Bank of America breached those contracts.

109.    Bank of America routinely and regularly breach its duties under both the SPA and their contract with individual Plaintiffs by failing to retain, employ, and supervise adequately trained staff; instituting and/or continuing with foreclosure proceedings against borrowers in a trial program; failing to provide written notices required by HAMP; and by deliberately acting to delay and otherwise frustrate loan modification processes; routinely demanding information already in its files; making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP; and failing to follow through on written and implied promises.

110.    Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make TPP payments and provide documentation.

111.    Plaintiffs have suffered harm and are threatened with additional harm from Bank of America's breach.  By making TPP payments both during and after the TPP, Plaintiffs forego other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home. On information and belief, some putative Class members have suffered additional harm in the form of foreclosure activity against their homes.

## COUNT II

### PROMISSORY ESTOPPEL, IN THE ALTERNATIVE

112.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

113.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

1      114.   Bank of America, by way of its TPP Agreements, made a representation to Plaintiffs

2   that if they returned the TPP Agreement executed and with supporting documentation, and made

3   their TPP payments, they would receive a permanent HAMP modification.

4      115.   Bank of America's TPP Agreement was intended to induce Plaintiffs to rely on it

5   and make monthly TPP payments.

6      116.   Plaintiffs did indeed rely on Bank of America's representation, by submitting TPP

7   payments.

8      117.   Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

9      118.   Plaintiffs' reliance was to their detriment.  Plaintiffs have yet to receive permanent

10   HAMP modifications and have lost the opportunity to fund other strategies to deal with their

11   default and avoid foreclosure.

## COUNT III

### VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTIONS 17200 ET SEQ.

14      119.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

15      120.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the

16   Class described above.

17      121.   The conduct of Bank of America as set forth herein constitutes unfair or deceptive

18   acts or practices, including its practice of leading borrowers to believe that it will permanently

19   modify their mortgage loans upon successful completion of a trial program.

20      122.   Bank of America's conduct as set forth herein has been unfair in violation of section

21   17200 because the acts or practices violate established public policy, and because the harm they

22   cause to consumers in California greatly outweighs any benefits associated with those practices.

23      123.   Bank of America's conduct as set forth herein resulted in loss of money or property

24   to Plaintiffs and Class members.

### V.    PRAYER FOR RELIEF

26   WHEREFORE, the Plaintiffs respectfully request the following relief:

27      A.    Certify this case as a class action and appoint the named Plaintiffs to be Class

28   representatives and their counsel to be Class counsel;

CLASS ACTION COMPLAINT                    - 23 -

010176-12 366276 V1

1    B.    Enter a judgment declaring the acts and practices of Bank of America complained of

2    herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing,

3    as well as a declaration that they are required by the doctrine of promissory estoppel to offer

4    permanent modifications to Class members;

5    C.    Grant a permanent or final injunction enjoining Bank of America's agents and

6    employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the

7    Class;

8    D.    Order Bank of America to adopt and enforce a policy that requires appropriate

9    training of their employees and agents regarding their duties under HAMP;

10   E.    Order specific performance of Bank of America's contractual obligations together

11   with other relief required by contract and law;

12   F.    Award restitution as wells as actual and statutory damages to the Plaintiffs and the

13   Class in amounts to be proven at trial;

14   G.    Award Plaintiffs the costs of this action, including the fees and costs of experts,

15   together with reasonable attorneys' fees; and

16   H.    Grant Plaintiffs and the Class such other and further relief as this Court finds

17   necessary and proper.

18                    **VI.    JURY TRIAL DEMANDED**

19          Plaintiffs demand a trial by jury on all issues so triable.

20   DATED: April 30, 2010              HAGENS BERMAN SOBOL SHAPIRO LLP

21

22                                     By:_____

23                                           JEFF D. FRIEDMAN
                                       715 Hearst Avenue, Suite 202
24                                     Berkeley, CA 94710
                                       Telephone: (510) 725-3000
25                                     Facsimile: (510) 725-3001
                                       jefff@hbsslaw.com
26

27

28

CLASS ACTION COMPLAINT                    - 24 -

010176-12  366276 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STEVE W. BERMAN
ARI Y. BROWN
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292
steve@hbsslaw.com
ari@hbsslaw.com

*Attorneys for Plaintiffs*
*Britta Brewer and Stacey Madamba*